**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JORGE J. LEAL, M.D.,**

             **Plaintiff,**

-vs-                                                **Case No. 6:08-cv-1062-Orl-22GJK**

**UNITED STATES DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES, et. al.,**

             **Defendants.**
_____

## REPORT AND RECOMMENDATION

TO THE UNITED STATES DISTRICT COURT

     Plaintiff Jorge J. Leal, M.D. (the "Plaintiff") appeals to the district court from a final decision of the Secretary of the Department of Health and Human Services (the "Secretary") finding no basis, pursuant to the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101 *et. seq.* (the "HCQIA" or the "Act"), to remove the filing of the Corrected Adverse Action Report (the "AAR") from the National Practitioner Data Bank (the "NPDB"). *See* Doc. No. 1. Pursuant to 5 U.S.C. § 706(2)(A) and for the reasons set forth below, the undersigned **RECOMMENDS** that the Secretary's decision be **AFFIRMED**.

**I.    BACKGROUND**

     On October 3, 2001, Plaintiff, a "urological clinician and surgeon," was involved in an incident at Cape Canaveral Hospital ("CCH") while waiting to perform surgery on a patient. R. 5, 28, 32, 153, 267. On October 4, 2001, Plaintiff was "summarily suspended" from all

privileges at CCH for 60 days. R. 31, 33.[1] On October 8, 2001, Plaintiff received a letter from Dr. Moore, the president of CCH's medical staff, stating:

> As a result of the incident . . . and your disruptive behavior, I have summarily suspended your clinical privileges, effective immediately. This action was taken by me on . . . Oct. 4, 2001, via phone, <u>is in the best interests of patient care</u> in the hospital pursuant to Section 6.2 of the [CCH] Medical Staff Bylaws.

R. 33 (emphasis added).

On November 7, 2001, CCH filed an Adverse Action Report with the NPDB stating that Plaintiff had been suspended for sixty (60) days for disruptive and destructive behavior. R. 2.[2] On November 20, 2001, Plaintiff submitted a response disputing the factual accuracy of the report, contending that the report was contrary to CCH's bylaws, and arguing that the suspension was not a reportable event under federal law. R. 2. On September 18, 2007, Claimant requested review from the Secretary regarding the report. R. 36-38. The Secretary notified the parties that the Secretary will only review the case to determine the following:

> **Whether a report should have been filed in accordance with the reporting regulations, and if so,**
>
> **If the information contained in the report is a factually accurate reflection of the action taken and the reasons the action was taken are specified in relevant documents.**

R. 36 (emphasis in original). The Secretary clarified that he will not review "the appropriateness of, or basis for, an adverse action. . . ." R. 36. "The Secretary can only determine if the action

---

[1] On October 4, 2001, Plaintiff received a telephone call from Rodney Moore, M.D., the president of CCH's medical staff, stating that he was "summarily suspended" from clinical privileges effective immediately. R. 31, 33.

[2] The Adverse Action Report states the following:
> The [Plaintiff ] was summarily suspended for sixty (60) days in accordance with [CCH's] Medical Staff Bylaws, Rules and Regulations for disruptive and destructive behavior.

R. 2, 121.

was reportable [under the regulations] and if the report accurately described the action and the reasons the action was taken." R. 36. Thus, the Secretary informed the parties that he would not be making de novo factual findings. *Id*.

On March 20, 2008, the Secretary informed the parties of the following:

> In reviewing [Plaintiff's] report, we have determined that CCH's narrative description is factually insufficient. According to the record . . . CCH reported [Plaintiff] for "summary or emergency suspension of clinical privileges (1632)." Specifically the record states that: ["]The physician was summarily suspended for sixty (60) days in accordance with [CCH's] Medical Staff Bylaws, Rules and Regulations for disruptive and destructive behavior.["] In that same section the Basis for Action states: "unprofessional conduct (10)"
>
> This is not a factually sufficient explanation for what happened. In fairness to the practitioner, NPDB reports must be complete, as well as accurate. Accordingly, please submit a correction to your original report narrative . . . stating specifically the nature of the problem with respect to [Plaintiff's] alleged "disruptive and destructive behavior" that caused CCH to suspend his clinical privileges. Please be specific about his actions deemed "unprofessional conduct." For example, did he engage in a physical altercation with another physician in the OR? Did he address nursing staff with inappropriate on [sic] profane language? Was he rude to patients or patients' families? Did he upend a crash cart or vandalize hospital equipment? Did he report to work under the influence of alcohol or recreational drugs? Or was it something else? We are not saying that [Plaintiff] did any of these things. We are using them only as examples.
>
> The information in the narrative must be specific enough so that future queriers knowing nothing about the events giving rise to the report will have an understanding of what the subject practitioner is alleged to have done, the nature of the action taken and the reasons for the report. Narrative descriptions that describe the allegations or actions taken in only vague or general terms are factually insufficient and do not meet the statutory reporting requirements.

R. 117-18.

3

On April 17, 2008, CCH filed a Corrected Adverse Action Report ("AAR") stating the following:

> [Plaintiff], while reacting to delays he experienced in scheduling and arranging for surgeries on his patient: 1) broke a telephone in the doctor's lounge; 2) flung a medical chart to the ground in the presence of a nurse who was requesting a written authorization to proceed with surgery; 3) threw jellybeans down the hallway in the surgical suite; 4) broke a copy machine in the surgical suite hallway by shattering its glass covering; 5) shoved a metal rolling cart into the entrance doors to the operating suite, damaging a door; and 6) verbally abused a nurse manager both on the telephone and in person by raising his voice, using profanity, calling her a liar and accusing her of being a prejudiced. His actions further cause various members of the nursing and technical staff to announce they were fearful of working with him in the future.

R. 153. On April 29, 2008, Plaintiff filed a response disputing the factual accuracy of the AAR and challenging whether it was reportable under federal law and regulations. R. 150-51. Plaintiff's affidavit states the following occurred on October 3, 2001:

> 3.  The "behavior" in question resulted from my frustration in dealing with unnecessary delays in getting a critically ill patient to surgery. . . . The delays were due to nursing errors and/or minor misunderstandings, miscommunications, delays in communications, inadequate scheduling of surgical teams, and other matters over which I had no control.
> 4.  At the end of a very long day, and with my patient still waiting for surgery at approximately 6:30 p.m., the following occurred:
> (a) While in the doctor's lounge, I was paged about another patient and used the lounge telephone to respond to the page. The telephone is located on a wall and has a long cord to allow movement around the room. The cord tangled on a chair or table and I tripped on the cord which pulled the phone from my hand and I stepped on the handle of the telephone. The handle broke when I stepped on it. I was alone in the doctor's lounge when this occurred. No patients were in the vicinity of the lounge at the time this

4

             happened.
- (b) Once it was determined that my patient would undergo surgery that evening, on my way to the operating room I noted the lid to the photocopier in the hallway was open. I closed the lid with some force as I walked by. I never broke stride. I continued walking to the OR. Later, it was shown to me that a corner of the glass panel on the copier was cracked. I assume, but do not know, that this occurred when I closed the lid. Again, no one witnessed this event, although a surgical technician stated she saw me near the copier. No patients were in the vicinity when this occurred. I voluntarily made full restitution for the replacement of the glass.
- (c) As I approached the OR, I encountered an empty metal table blocking the doors to the OR. I pushed the table out of my way and proceeded into the OR. No patients were in the vicinity when this occurred. It is alleged that when I pushed the metal table, a corner of the table hit a doorway. This was in a hallway outside the OR. The patient was already in the OR and this table needed to be moved to allow the patient's bed to be removed from the OR.
- (d) I spoke sternly to a nurse who continually advised me there was no cardiac clearance for my surgical patient although I had spoke to the cardiologist earlier in the day and confirmed that he had cleared the patient for surgery. I stated to the nurse that she was either being untruthful with me or she did not know what was going on in her own unit. Later, it was determined that the patient *did* have cardiac clearance but did not have *pulmonary* clearance. Because the patient's condition was potentially life-threatening, after I became aware that pulmonary clearance had not been given, I documented to the patient chart that surgery should still proceed as the risks of delaying surgery outweighed any pulmonary concerns.
5. At 6:50 p.m., I finally took my patient to surgery. Surgery was completed at 7:44 p.m., and the patient was taken to recovery in satisfactory condition. The surgery itself went smoothly and all members of the surgical team performed in a cordial, professional manner.

R. 28-29 (emphasis in original). Plaintiff submitted a supplemental affidavit stating the following:

5

2. On of the claims of CCH . . . is that I "flung" a medical chart to the ground in the presence of a nurse who was requesting a written authorization to proceed with surgery. This is not a true statement and at no time on October 3, 2001 did I "fling a chart." I took the chart from [the nurse] while in the doctor's lounge. Part of the chart fell to the floor during the exchange from [the nurse] to me. No patients were in the vicinity of the lounge when this occurred.

3. . . . The conversation with [the nurse] occurred in the physician's lounge outside the presence of any patients. When the chart was given to me there were loose papers in the chart which fell to the floor. This was entirely unintentional and was not given a second thought at the time. It was certainly not done because I was "reacting to delays."

4. One of the claims by CCH is that while reacting to delays I threw jelly beans down a hallway in the surgical suite. . . . While I was waiting for my patient to go to surgery, I removed a handful of jelly beans from a canister and ate a couple of them. I did not like the taste, so I threw the remaining jelly beans in my hand into a nearby trash can. I did not see any of them hit the floor and I certainly did not "throw jelly beans down a hallway." If any of the jellybeans landed on the floor, I was unaware of it. I did not see any on the floor at any time. . . .

7. One of the claims by CCH is that while reacting to delays I verbally abused a nurse manager both in person and on the telephone. . . . At no time on October 3, 2001, did I yell at [the nurse manager] or use profanity in addressing her. Further, at no time did I speak to [the nurse manager] in person on October 3, 2001.

8. On October 3, 2001, I spoke to [the nurse manager] by telephone on two occasions. During the first conversation, she told me that the delay was due to prior operations taking longer than anticipated, but failed to inform me that my first surgery of the day was going to be delayed because another physician was running late. When I asked her if the delay was in part due to a physician being late, she admitted to [the] fact. I then told her that she was either lying to me or she did not know what was going on in her department. I questioned her on the hospital's policy concerning physicians who are not at the hospital on time for their surgeries and questioned her about whether that

> policy was being fairly applied to all physicians. This is why CCH claims I called [the nurse manager] a liar. This is what CCH claims constitutes an accusation of "prejudice" on my part. . . .
>
> 10. At no time on October 3rd or October 4th 2001, nor at any other time, did any member of the nursing or technical staff at CCH indicate to me that they were fearful of working with me in the future.

R. 203-05. On April 30, 2008, Plaintiff sought the Secretary's review of the AAR. R. 156.

On June 9, 2008, the Secretary entered his final decision finding:

> There is no basis on which to conclude that the report should not have been filed in the NPDB or that it is not accurate. [Plaintiff's] request that the report be voided from the NPDB is hereby denied. The report will remain in the NPDB.

R. 266. In his final decision, the Secretary stated the following:

> In making this finding, the Secretary is explicitly not making any findings concerning the merits of allegations against you which served as the basis for CCH's investigation or the adequacy of the due process provided to you by CCH. Issues concerning the merits of the allegations and the due process provided to you must be resolve by you and CCH. The Secretary has no authority to decide these issues.

R. 266. The Secretary detailed CCH's factual allegations and Plaintiff's dispute of those allegations. R. 267-69. The Secretary also addressed Plaintiff's claim that the AAR was not reportable under federal law, regulations, and the Secretary's guidelines. R. 268-70. The Secretary stated that the NPDB's Guidebook contains the requirements for reporting "summary suspensions." R. 269. The Secretary stated that to be reportable, a summary suspension must be:

1) In effect or imposed for more than 30 days;
2) Based on professional competence or professional conduct of the physician, dentist, or other health care practitioner that adversely affects or could adversely affect, the health or welfare of a patient;

7

> and
>
> 3)  The result of a professional review action taken by a hospital or other health care entity.

R. 269-70. The Secretary found that "all of the above requirements were present for your suspension." R. 270.

> Contrary to your assertion, "imminent danger" is not a necessary element of a reportable summary suspension. While it is NPDB's assumption that hospitals imposing summary suspensions do so for purposes of addressing "imminent danger," it is not a necessary element for a reportable summary suspension.

R. 270. The Secretary also concluded that Plaintiff's contentions regarding the basis or veracity of the specific factual allegations were "all beyond the scope of [the Secretary's] review." R. 270. "Since the Secretary has concluded that the action was reportable and that the report accurately reflects the record, the report will remain in the NPDB." R. 270.

On July 1, 2008, Plaintiff filed the present action. Doc. No. 1. On October 17, 2008, the Court set a briefing schedule (Doc. No. 17) and on December 12, 2008, Plaintiff filed his brief in opposition to the Secretary's final decision. Doc. No. 25. On February 4, 2009, the Secretary filed a brief in support of his final decision. Doc. No. 27. The case is now ripe for review.[3]

## II.  THE PARTIES' POSITIONS

Pursuant to 5 U.S.C. § 706(2), Plaintiff asserts that the Secretary's decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Doc. No. 25 at 10-20. Plaintiff assigns two errors to the Secretary's decision: 1) the incident in question was not a reportable event or, otherwise stated, the action taken by CCH was not a "professional review action" because the action was not based on the professional competence or professional conduct

---

[3] On February 9, 2009, CCH filed a motion for leave to appear as amicus curiae. Doc. No. 28. On April 28, 2009, the undersigned filed a report recommending CCH's motion be denied. Doc. No. 31. The Court adopted the undersigned's recommendation and denied CCH's motion. Doc. No. 32.

of Plaintiff that adversely affected or could adversely affect the health or welfare of a patient (citing *Simpkins v. Shalala*, 999 F.Supp. 106, 111-12 (D. D.C. 1998); *Costa v. Leavitt*, 442 F.Supp.2d 754, 773 (D. Neb. 2006); 42 U.S.C. §§ 1113(a), 11112(c), 11151(9)(E); 45 C.F.R. § 60.3; NPDB's Guidebook (the "Guidebook") at E-19, E-21 found at http://www.npdb-hipb.hrsa.gov/npdbguidebook.html); and 2) the Secretary did not review or otherwise make any findings regarding the accuracy of the record, but instead simply concluded that because CCH reported to the NPDB that Plaintiff had been summarily suspended, Plaintiff admitted same and the AAR was factually accurate (citing 45 C.F.R. § 60.14(c)(ii); *Simpkins v. Shalala*, 999 F.Supp. 106 (D.D.C. 1998); *Costa v. Leavitt*, 442 F.Supp.2d 754 (D. Neb. 2006)). *Id*. Plaintiff requests that this Court reverse the Secretary's decision and remand the case with directions to void the AAR in whole or in part. Doc. No. 25 at 10-21.

The Secretary argues that the Secretary's decision is supported by substantial evidence and is not arbitrary, capricious, an abuse of discretion, or contrary to the law. Doc. No. 27 at 1. The Secretary maintains that: 1) the action taken by CCH was reportable because Plaintiff's conduct could potentially have adversely impacted a patient's well being and actual imminent danger to the health and welfare of a patient is not required for an action to be reportable (citing *Bryan v. James E. Holmes Regional Medical Center*, 33 F.3d 1318, 1326, 1334 (11th Cir. 1994); *Gordon v. Lewistown Hospital*, 423 F.3d 184, 203 (3d Cir. 2005); and 2) the AAR is factually accurate because the Secretary's review does not extend to the merits of the hospital's action (citing Guidebook at F-3). Doc. No. 27 at 10-22. The Secretary also maintains that Plaintiff's reliance on *Simpkin*s and *Costa* are misplaced because neither case is on point or controlling.

9

Doc. No. 27 at 17-18. The Secretary requests that his final decision be affirmed. Doc. No. 27 at 1.

III. **LEGAL STANDARDS**

   A. **HCQIA'S STATUTORY AND REGULATORY SCHEME**

The underlying purpose of the HCQIA is to prevent malpractice, to improve the quality of healthcare, and to "restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance" through effective professional peer reviews that are reportable to a national data bank. 42 U.S.C. § 11101(2) (1986); Guidebook at A-1; *see also Johnson v. Spohn, et. al.*, 2009 WL 1766557 at *4 (5th Cir. June 23, 2009). HCQIA led to the creation of the NPDB which acts as "an information clearinghouse, to collect and release information related to the professional competence and conduct of physicians, dentists, and, in some cases other health care practitioners." 45 C.F.R. § 60.1; Guidebook at A-2 – A-3. Under the HCQIA, certain "professional review actions" taken by hospitals and other health care entities against physicians must be reported to the NPDB and the Secretary through state boards of medical examiners. 42 U.S.C. §§ 11133(a)(1); 11134(a)-(b). The HCQIA defines a "professional review action" as follows:

> The term "professional review action" means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is <u>based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients)</u>, and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and

> also includes professional review activities relating to a professional review action. In this chapter, an action is not considered to be based on the competence or professional conduct of a physician if the action is primarily based on-- . . . .
> (E) any other matter that does not relate to the competence or professional conduct of a physician.

42 U.S.C. § 11151(9) (emphasis added). In *Gordon v. Lewistown Hospital*, 423 F.3d 184, 203 (3d Cir. 2005), the Third Circuit stated that "[t]he plain language of the statute indicates that the breadth of 'conduct' encompassed within the definition of 'professional review action' by the inclusion of conduct that 'could affect adversely the health or welfare of a patient.'" *Id*. Thus, "[t]he statute contemplates not only potential harm through use of the term 'could,' but it also affords protection to actions taken against physician conduct that either impact or potentially impacts patient 'welfare' adversely, meaning patient 'well being in any respect; prosperity.'" *Gordon*, 423 F.3d at 203. Thus, to be reportable, the activity or allegation is limited to those actions based on the competence or professional conduct that adversely affects or could potentially have an adverse affect on the health or welfare of patient(s). *See generally Costa v. Leavitt*, 442 F.Supp.2d 754, 772 (D. Neb. 2006). Because of this limitation, the Guidebook offers the following example:

> Example 4: A 31-day suspension is imposed on a physician for failure to complete records.
> *Such a suspension would be reportable to the* NPDB *if the failure to complete medical records related to the physician's professional competence or conduct and adversely affects or could adversely affect a patient's health or welfare.*

Guidebook at E-22 (emphasis in original). Thus, a failure to properly complete medical records is reportable.

11

Hospitals or other health care entities are required to report to the NPDB any professional review action "that adversely affects the clinical privileges of a physician for longer than 30 days." 42 U.S.C. § 11133(a)(1)(A).

> Information reported to the NPDB is accessible to state licensing boards and to any health care entity where the physician is employed or affiliated or is seeking employment or affiliation. *See* 42 U.S.C. §§ 11137(a); 45 C.F.R. §§ 60.11. In fact, hospitals are required to request information from the NPDB whenever a physician applies for a position on its medical staff or for clinical privileges, and also every two years to check the status of each physician who currently is on its medical staff or has clinical privileges. *See* 42 U.S.C. §§ 11135(a); 45 C.F.R. §§ 60.10. A person or entity reporting information as required by the HCQIA is immune from civil liability unless the information was known to be false. *See* 42 U.S.C. §§ 11137(c).

*Costa*, 442 F.Supp.2d at 756. After a professional review action is submitted to the NPDB, a physician may dispute the accuracy of the AAR to the Secretary. 45 C.F.R. § 60.14.

Upon review, the Secretary will either: 1) conclude that the information in the AAR is accurate, include a statement from the physician describing the dispute between the health care entity and physician, and provide an explanation of the basis for the Secretary's decision; or 2) conclude that the AAR was incorrect and send corrected information to previous inquirers. 45 C.F.R. § 60.14(2)(i-ii). According to the Guidebook, the Secretary:

> . . . reviews disputed reports <u>only for accuracy of factual information and to ensure that the information was required to be reported</u>. The Secretary does not review the merits of . . . or appropriateness of, or basis for, a health care entity's professional review action. . . .

*Id.* at F-3 (emphasis added).

## B. STANDARD OF REVIEW

The Court's standard of review is governed by the Administrative Procedure Act (the "APA"), 5 U.S.C. § 501 *et. seq.*, and is limited to a determination of whether the Secretary's decision is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or not supported by substantial evidence. 5 U.S.C. § 706(2)(A), (E). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991). A reviewing court shall not substitute its own judgment for that of the agency. *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). Judicial review of the agency's action under the APA is limited to the record before the agency at the time the agency issued its decision. *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973).

## VI. ANALYSIS OF ALLEGED ERRORS

### A. Whether the Conduct was Reportable

As set forth above, for a summary suspension to be reportable it must be: 1) in effect or imposed for more than 30 days; 2) based on professional competence or professional conduct of the physician that adversely affects or could adversely affect, the health or welfare of a patient; and 3) the result of a professional review action taken by a hospital. *See* 42 U.S.C. § 11151(9). In the present case, there is no dispute that the first and third elements exist. Thus, the sole issue is whether substantial evidence supports the Secretary's determination that the report was based

on professional conduct that adversely affected or could have adversely affected the health or welfare of a patient.

Plaintiff argues that the conduct at issue, even if accurately reported by CCH, was not properly reportable because it did not adversely affect the health or welfare of a patient, and no patient was in imminent danger as a result of Plaintiff's conduct. Doc. No. 25 at 17-18. While the record shows that no patient was actually adversely affected by Plaintiff's conduct or misconduct, the statutory element is broader than Plaintiff states and allows for the report of conduct which <u>could</u> have adversely affect or <u>potentially</u> have adversely affected the health or welfare of a patient. *See* 5 U.S.C. § 11151(9); *see also Gordon*, 423 F.3d at 203. It is undisputed that the Plaintiff's patient was awaiting surgery for a potentially life threatening condition. R. 28-29, 153. Plaintiff maintains that the behavior at issue resulted from his frustration in getting his patient to surgery. After a careful review of the AAR and the entire record, the undersigned concludes that there is substantial evidence Plaintiff became agitated, shoved, slammed and damaged various equipment, threw a patient's file when a nurse was requesting written authorization for surgery, and verbally abused a nurse manager during discussions about the order in which surgeries were taking place. Such actions could potentially have an adverse effect on a patient's health and/or welfare. While Plaintiff clearly disputes the factual accuracy of these allegations, there is substantial evidence in the record to support the Secretary's finding that the second element described above was established.

Dr. Moore's October 8, 2001 letter explaining the basis for the summary suspension, clearly states that the decision was made "in the best interests of patient care." R. 33. In *Bryan*

*v. James E. Holmes Regional Medical Center*, 33 F.3d 1318, 1337 (11th Cir. 1994), the Eleventh Circuit stated the following:

> HCQIA clearly grants broad discretion to hospital boards with regard to staff privileges decisions. Accordingly, . . . the role of federal courts "on review of such actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges.

*Id.* The record contains evidence that CCH summarily suspended Plaintiff for professional misconduct and "in the best interests of patient care." R. 33, 153. Thus, the undersigned recommends that the Court find it was not arbitrary or capricious for the Secretary to determine that substantial evidence existed showing that Plaintiff's conduct could have adversely affected the health or welfare of patient(s). Accordingly, the undersigned recommends that the Court also find the summary suspension was properly reportable.

**B. Whether the Secretary Properly Determined Factual Accuracy**

Plaintiff asserts that the Secretary did not determine whether or not the AAR was factually accurate, but instead merely determined the AAR was factually accurate because there was a report that Plaintiff had been suspended, Plaintiff admitted to being suspended, and the record contained evidence showing Plaintiff had been suspended. Doc. No. 25 at 10-11. The regulations state that after reviewing the record the Secretary will either conclude that the information is accurate, include a brief statement from the physician explaining the dispute, and offer an explanation of the basis for the decision. 45 C.F.R. § 60.14(c)(2)(i-ii). As set forth above, the Guidebook also explains that the Secretary does not review the merits or basis for a health care entity's professional review action. *See* Guidebook at F-3. Based on the information in the record which was provided by CCH, the undersigned recommends that the Court find the

15

Secretary's decision finding the AAR accurate is not arbitrary or capricious and is in accordance with the regulations and the Guidebook.

## VI.  CONCLUSION

Based on the above stated reasons, the undersigned **RECOMMENDS** that the Court:

1) **AFFIRM** the final decision of the Secretary pursuant to the APA;

2) Direct the Clerk to enter a separate judgment in favor of the Secretary; and

3) Direct the Clerk to close the case.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RECOMMENDED** in Orlando, Florida on July 28, 2009.

_____
GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE


The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:
Presiding District Judge


Sally A. Rasmussen
Mattson, Ricketts, Davies, Stewart & Calkins
134 South 13th Street, #1200
Lincoln, NE 68508

Ralph E. Hopkins
U.S. Attorney's Office
501 West Church Street, Suite 300
Orlando, Florida    32805

William Burgess, Senior Attorney

Office of General Counsel, Public Health Division
US Department of Health & Human Services
Room 4A-53,
5600 Fishers Lane
Rockville, MD 20857